CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
JUN 28 2017
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| DOME TECHNOLOGY, LLC, | Civil Action No. 3:16CV00069 |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | Hon. Glen E. Conrad |
| GOLDEN SANDS GENERAL CONTRACTORS, INC., et al., | Chief United States District Judge |
| Defendants. | |

Dome Technology, LLC ("Dome Technology") filed this diversity action against Golden Sands General Contractors, Inc. ("Golden Sands") and American Business Continuity Domes, Inc. ("ABC Domes"), asserting claims for breach of contract. The case is presently before the court on the defendants' motion to compel arbitration. For the following reasons, the court will grant the defendants' motion.

## Background

Dome Technology is an Idaho limited liability company that specializes in constructing "large-scale industrial bulk storage reinforced concrete domes." Am. Compl. ¶ 1, Docket No. 25. Golden Sands is a Florida corporation that offers general contracting services. Id. ¶ 2. ABC Domes is a Florida corporation that specializes in leasing concrete domes, primarily business continuity domes, which are built to house a company's systems infrastructure. See id. ¶¶ 3, 11.

In or around December of 2012, Dome Technology, Golden Sands, and ABC Domes entered into a Strategic Alliance Agreement, pursuant to which the parties "would collaborate, work together, and provide specialized services in bidding on, procuring, and completing construction contracts for the construction of business continuity and disaster relief dome projects,

all while remaining distinct and separate entities." Id. ¶¶ 10, 12. To that end, the parties agreed to "work together in good faith through open communication, coordination, and cooperation to develop mutually beneficial Cooperative Project agreements."[1] Strategic Alliance Agreement § 5, Docket No. 25-1.[2] The parties entered into the Strategic Alliance Agreement "for the purpose of establishing the general terms 1) governing their participation in this Agreement, 2) governing their participation in Cooperative Projects, and 3) governing their relationship as Joint Business Development partners." Id. § 3(H). The parties agreed that the Strategic Alliance Agreement would apply to all Cooperative Projects. See id. § 3(F) ("All architectural dome projects nationally and internationally will be designated as Cooperative Projects and will fall under the scope of this Agreement.").

The Strategic Alliance Agreement sets forth the general obligations of the parties in connection with the Cooperative Projects. See generally id. §§ 5.1-5.3 (outlining the parties' contractual responsibilities). The parties agreed that Golden Sands would serve as the preferred general contractor for the Cooperative Projects, see id. § 3(I); that ABC Domes would facilitate a mutually acceptable project construction agreement between Golden Sands as general contractor and Dome Technology as subcontractor, see id. § 5.2; and that Golden Sands and Dome Technology would enter into separate subcontract agreements on a project-by-project basis, see id. §§ 5.2, 7.1. The parties further agreed that ABC Domes would "guarantee[] Golden Sands' payment obligations to Dome Technology under any subcontract subject . . . to Golden Sands'

---

[1] The term "Cooperative Project," as used in the Strategic Alliance Agreement, "means a project shared by ABC Domes and Dome Technology that comprises the design and construction of one or more architectural domes." Strategic Alliance Agreement § 3(F), Docket No. 25-1.

[2] Although Section 5 of the Strategic Alliance Agreement specifically references ABC Domes and Dome Technology, Golden Sands is identified as a party bound by the terms of the agreement, including Section 5. See id. § 2.

2

contractual rights of setoff, chargeback and other nonpayment defenses provided for in the subcontract." Id. § 7.1.

The Strategic Alliance Agreement also contains the following "Dispute resolution" provision, which includes the arbitration clause on which the defendants' motion is based:

> Any unresolved disputes between the Parties shall be first resolved by nonbinding mediation. Any dispute, claim, or controversy arising solely between the Parties out of or relating to any interpretation, construction, performance or breach of this Agreement (including both actions in contract and in tort) arising out of or relating to the enforcement of this Agreement, (including the formation, performance, modification or extension of this agreement) or any form of relief (including damages, rescission, specific performance, injunction, and punitive damages) that is not resolved by nonbinding mediation shall be settled exclusively by arbitration. The arbitration shall be held in a location mutually agreeable to the parties, or if not mutually agreed, then in Orlando[,] Florida. It shall be conducted under the auspices of and by the rules of the American Arbitration Association. Discovery will be allowed at the discretion of the arbitrator. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator will be final, conclusive and binding on the Parties to the arbitration. The Parties consent that any notice, motion, application or any paper concerning the arbitration may be served by certified mail, return receipt requested, or by personal service provided it allows reasonable time for appearance. The arbitration proceedings must be begun within one year after the claim arises. Failure to begin arbitration proceedings within that period will constitute an absolute bar to the institution of any proceedings on that claim and a waiver of that claim. Judgment whether in damages or injunction or otherwise may be entered on the arbitrator's decision in any court having competent jurisdiction, the same as if the arbitration decision had originally been rendered by that court.
>
> The foregoing provision for arbitration of disputes between the Parties shall not apply in cases where a customer or other third Party brings a claim or files a complaint against one or both of the Parties in a court having competent jurisdiction over the Parties named in the action or proceeding, or in cases involving personal injury (including workers compensation claims) or death . . . .

Id. at § 14.4.

The parties agreed that the Strategic Alliance Agreement would "remain intact for fifteen (15) years," unless "all Parties agree" to terminate the agreement. Id. § 14.3; see also id. ("Termination or withdrawal by a Party or Parties from this Agreement may only occur upon approval of all the Parties of the Alliance."). They further agreed that the Strategic Alliance Agreement may be modified only if "all Parties agree to such modifications." Id.

As contemplated by the Strategic Alliance Agreement, Golden Sands and Dome Technology entered into a Master Subcontractor Agreement in August of 2013. See Am. Compl. ¶ 17. The Master Subcontractor Agreement provides that it "supersedes all prior agreements, written or oral, between Golden Sands and [Dome Technology] relating to the subject matter of this Agreement."[3] Master Subcontractor Agreement at 1, Docket No. 25-2. The Master Subcontractor Agreement contains general terms and provisions applicable to work performed under the individual project subcontracts, including provisions related to insurance coverage, scheduling, payment, and indemnification. The Master Subcontractor Agreement also contains the following provision titled "LEGAL NOTICES AND DISPUTES":

> [I]n order to avoid conflicts of law, if a dispute arises out of either Party's performance under a Subcontract Agreement, then the validity, interpretation and performance of this Agreement shall be governed by the Laws of the State in which the corresponding Subcontract Agreement project is located. In the absence of a disputed Subcontract Agreement as provided above, the validity, interpretation, and performance of this Agreement, standing alone, shall be governed by the Laws of the State of Florida and in such case only any judicial proceeding shall be brought in the County of Miami-Dade, Florida within two (2) years of the date the cause of action accrued, but in no event after final payment to the Subcontractor. Subcontractor agrees to participate in and be bound by any proceedings which directly or indirectly relate[] to this Agreement (litigation, arbitration and/or mediation). No dispute or controversy shall interfere with the progress of the construction and Subcontractor shall proceed with the work without causing interruption, deficiency or delay. Notwithstanding anything in the

---

[3] ABC Domes is not a party to the Master Subcontractor Agreement.

4

> foregoing to the contrary, the exclusive legal jurisdiction as well as the validity, interpretation, and performance under any Subcontract Agreement shall be in the appropriate courts of and governed by the
>
> Laws of the State where the project that is the subject of the Subcontract Agreement is located.

Id. § 10.

The parties successfully bid on a number of architectural dome construction projects throughout the United States, including projects at the North Anna Nuclear Generating Station in Louisa County, Virginia (the "North Anna Project") and the Surry Nuclear Power Plant in Surry County, Virginia (the "Surry Project"). On August 6, 2013, Golden Sands and Dome Technology entered into a subcontract agreement for the construction of a dome for the North Anna Project (the "North Anna Subcontract"). That same day, they entered into a subcontract agreement for the construction of a dome for the Surry Project (the "Surry Subcontract"). The subcontracts provide that the "Subcontractor [Dome Technology] is to perform the tasks set forth in, and pursuant to the terms of this subcontract, and in accordance with the terms of the Master Subcontract Agreement." North Anna Subcontract 2, Docket No. 25-3; Surry Subcontract 2, Docket No. 25-4. ABC Domes is not a party to the North Anna Subcontract or the Surry Subcontract, and neither subcontract contains its own dispute resolution provision.

After entering into the subcontracts for the North Anna Project and the Surry Project, Dome Technology began providing services and materials for each project as required under the respective subcontracts. At some point during the construction phase, Golden Sands asked Dome Technology to assign certain portions of Dome Technology's scope of work over to Golden Sands. "Specifically, Golden Sands requested that Dome Technology assign Golden Sands[] the responsibility to construct the impact blast doors and man door concrete entry ways on each dome." Am. Compl. ¶ 44. Although "Dome Technology never signed a written change order,

5

. . . Golden Sands took the scope of work from Dome Technology" and "subcontracted with a third party who came in and took over these portions of the work from Dome Technology." Id. ¶¶ 45-46.

Dome Technology alleges that it fully completed its remaining obligations under the subcontracts. In March and September of 2014, Dome Technology submitted invoices to Golden Sands for the work and materials provided for the North Anna Project. Golden Sands only made partial payments on the invoices, leaving an unpaid balance of $350,973.77. In July, October, and December of 2014 and in January of 2015, Dome Technology submitted invoices for the work and materials provided for the Surry Project. Golden Sands only made partial payments on the invoices, leaving an unpaid balance of $363,880.85.

Golden Sands' justification for withholding certain amounts was that it had issued deductive change orders for cost overruns incurred by its third-party subcontractor, who took over the scope of work for the doors on both projects. Dome Technology contends that the deductive change orders are not supportable because Golden Sands assumed responsibility for all cost overruns incurred after it took over the scope of work for the project doors and hired another subcontractor to perform the work. Additionally, Dome Technology claims that Golden Sands did not pay for certain materials, including concrete forms, concrete, and rebar, which were provided at Dome Technology's own expense.

On July 2, 2015 and September 24, 2015, Dome Technology sent correspondence to Golden Sands and ABC Domes requesting full payment of the amounts allegedly due on the North Anna Project and the Surry Project. Golden Sands and ABC Domes have refused to make the requested payments.

## Procedural History

The payment disputes at issue in this action are not the only disputes between Dome Technology and the defendants. On September 1, 2016, following an unsuccessful mediation, Golden Sands and ABC Domes jointly filed with the American Arbitration Association a demand for arbitration against Dome Technology, in accordance with the dispute resolution provision of the Strategic Alliance Agreement. On September 16, 2016, Dome Technology answered the arbitration demand and filed a counterclaim against Golden Sands and ABC Domes. Dome Technology has alleged that the defendants' refusal to pay for work performed under the North Anna Subcontract and the Surry Subcontract constitutes a material breach of the Strategic Alliance Agreement. However, Dome Technology maintains that arbitration is not the appropriate forum to seek the recovery of funds allegedly due under the subcontracts.

Accordingly, after filing its counterclaim in the arbitration proceeding, Dome Technology filed this action seeking to recover amounts allegedly owed for services and materials provided under the North Anna Subcontract and the Surry Subcontract. In the amended complaint, filed on March 6, 2017, Dome Technology asserts the following claims: (1) breach of the North Anna Subcontract against Golden Sands; (2) breach of the Surry Subcontract against Golden Sands; (3) breach of the guarantee of subcontract payment against ABC Domes; and (4) joint venture liability against ABC Domes.

On March 20, 2017, Golden Sands and ABC Domes filed the instant motion to compel arbitration.[4] The court held a hearing on the motion on May 12, 2017. The motion has been fully briefed and is now ripe for review.

---

[4] The defendants also moved to stay discovery pending a decision on their motion to compel arbitration. In response, the plaintiff agreed to postpone discovery. Accordingly, the motion to stay discovery will be dismissed as moot.

## Discussion

The Federal Arbitration Act ("FAA") governs the rights and responsibilities of the parties with respect to an arbitration agreement. Patten Grading & Paving Inc. v. Skanska U.S. Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). The Supreme Court of the United States has interpreted the FAA to reflect "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp., 460 U.S. at 24. The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3.

The United States Court of Appeals for the Fourth Circuit has held that a party can compel arbitration under the FAA if it establishes four elements: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." Adkins v. Labor Ready, Inc., 303 F.3d 496, 500-01 (4th Cir. 2002) (citation and internal quotation marks omitted). In this case, only the second element is in dispute. This element involves two questions: (1) whether there is a "valid agreement to arbitrate," and (2) whether "the dispute in question falls within the scope of the arbitration agreement." Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 563 (4th Cir. 2015) (citing Muriithi v. Shuttle Express, Inc., 712 F.3d 173, 179 (4th Cir. 2013)); see also A&G Coal Corp. v. Integrity Coal Sales, Inc., 600 F. Supp. 2d 709, 713 (W.D. Va. 2009).

8

I.  **<u>Existence of a Valid Arbitration Agreement</u>**

The first question—whether a valid, enforceable arbitration agreement exists—"is a matter of contract interpretation governed by state law." Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 699 (4th Cir. 2012); see also Adkins, 303 F.3d at 501 ("Whether a party agreed to arbitrate . . . is a question of state law governing contract formation."). When the parties dispute whether an obligation to arbitrate exists, "the presumption in favor of arbitration does not apply." Noohi v. Toll Bros., Inc., 708 F.3d 599, 611 n.6 (4th Cir. 2013) (citing Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010)). It is "[o]nly at the second step of the analysis—determining the scope of the arbitration agreement—[that] courts apply the federal policy favoring arbitration and resolve ambiguities in favor of arbitration." Sharpe v. AmeriPlan Corp., 769 F.3d 909, 914 (5th Cir. 2014); see also Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011) ("Here, because the parties dispute not the scope of an arbitration clause but whether an obligation to arbitrate exists, the presumption in favor of arbitration does not apply.").

In this case, the defendants argue that the arbitration clause in the Strategic Alliance Agreement is valid and enforceable and that all of Dome Technology's claims fall within the scope of the arbitration clause. In response, Dome Technology argues that the arbitration clause in the Strategic Alliance Agreement was "superseded" by virtue of the Master Subcontractor Agreement's merger and forum selection clauses and that, under the forum selection clause, this court has exclusive jurisdiction over the claims asserted in the amended complaint.

The issue of whether an arbitration clause conflicts with, or was superseded by, another provision is "properly analyzed under the 'validity' step of the arbitration analysis." Sharpe, 769 F.3d at 915 (citation omitted). Accordingly, this issue is governed by Virginia law, which the parties agree applies in this case, and the presumption in favor of arbitration is not implicated.

9

See id.; see also Mission Residential, LLC v. Triple Net Props., LLC, 654 S.E.2d 888, 890 (Va. 2008) ("When the question before the court is whether the parties have agreed to arbitrate, there is no presumption in favor of arbitrability.").

Under Virginia law, contracts between parties are subject to the following basic rules of interpretation:

> Contracts are construed as written, without adding terms that were not included by the parties. Where the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning. A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used. Furthermore, contracts must be considered as a whole without giving emphasis to isolated terms. Finally, no word or clause in a contract will be treated as meaningless if a reasonable meaning can be given to it, and parties are presumed not to have included needless words in the contract.

TM Delmarva Power, LLC v. NCP of Va., LLC, 557 S.E.2d 199, 200 (Va. 2002) (internal citations and quotation marks omitted). Accordingly, in resolving the issue of whether the arbitration clause in the Strategic Alliance Agreement was superseded by provisions in the Master Subcontractor Agreement, the court must consider the contracts as a whole and "harmonize[]" their provisions, "giving effect to each when reasonably possible." Schuiling v. Harris, 747 S.E.2d 833, 837 (Va. 2013).

### A. Merger Clause

Dome Technology first points to the merger clause in the Master Subcontractor Agreement to support its position that the arbitration clause is not valid and enforceable. However, the merger clause merely provides that the Master Subcontractor Agreement "supersedes all prior agreements, written or oral, between Golden Sands and [Dome Technology] relating to the subject matter of this Agreement." Master Subcontractor Agreement at 1. The Master Subcontractor Agreement, to which ABC Domes is not a party, includes the "standard set of construction general

terms and conditions" contemplated by the Strategic Alliance Agreement. Strategic Alliance Agreement § 5.3. Neither the merger clause nor any other provision of the Master Subcontractor Agreement indicates that the parties intended for the Master Subcontractor Agreement to completely supersede the Strategic Alliance Agreement or its arbitration clause.[5] Indeed, the reading of the merger clause suggested by Dome Technology would make little sense, given that ABC Domes is not a party to the Master Subcontractor Agreement or the subcontracts for the North Anna and Surry Projects. Moreover, the parties expressly agreed that the Strategic Alliance Agreement would "remain intact for fifteen (15) years," that it would govern their participation in all of the architectural dome projects, and that it could be modified or terminated only if "all Parties agree to such modifications or termination." Strategic Alliance Agreement §§ 3(F)-(H), 14.3 (emphasis added).

Considering the contracts as a whole, the court concludes that the merger clause in the Master Subcontractor Agreement cannot be construed to repudiate the Strategic Alliance Agreement, which was entered into by all three parties, or its arbitration clause. Instead, the court reads the merger clause as providing that the Master Subcontractor Agreement only supersedes prior oral or written agreements between Dome Technology and Golden Sands relating to the subject matter of that agreement (i.e., the general terms and conditions applicable to the subcontract work performed for Golden Sands by Dome Technology).

### B. Forum Selection Clause

The court turns next to the forum selection clause in the Master Subcontractor Agreement. Dome Technology argues that this court has "exclusive jurisdiction over the payment claims based

---

[5] In this regard, the case is distinguishable from GKD-USA, Inc. v. Coast Mach. Movers, 126 F. Supp. 3d 553 (D. Md. 2015), on which Dome Technology relies. In that case, the integration clause in a subsequent agreement expressly provided that the parties "agree[] that this document shall constitute the entire contract between [the parties] ." Id. at 556.

on the [Master Subcontractor Agreement] forum selection clause," and thus that the forum selection clause supersedes the preexisting arbitration clause. Pl.'s Br. in Opp'n 10, Docket No. 31. For the following reasons, however, the court is unable to agree.

First, the forum selection clause does not bestow "exclusive jurisdiction" on this court. Instead, the clause provides that with respect to "the validity, interpretation, and performance under any Subcontract Agreement," the "courts of . . . the State where a project that is the subject of the Subcontract Agreement is located" shall have "exclusive <u>legal</u> jurisdiction." Master Subcontractor Agreement § 10 (emphasis added). As other courts have noted, arbitration is a method of "dispute resolution without resort to court action." <u>E.C. Durr Heavy Equip. Co. v. Bd. of Comm'rs of Orleans Levee Bd.</u>, 719 So. 2d 136, 138 (La. Ct. App. 1998). It "does not involve legal jurisdiction in the same sense as a judicial proceeding." <u>Id.</u>; <u>see also</u> <u>Paradigm Sols. Grp. v. Shanghai Precision Tech. Corp.</u>, No. 15-CV-539, 2015 U.S. Dist. LEXIS 70596, at *7-9, 2015 WL 3466017, at *3 (S.D. Cal. June 1, 2015) (noting that "arbitration is not a 'legal action'" and finding no contradiction between the arbitration and forum selection clauses); <u>Sims v. Clarendon Nat'l Ins. Co.</u>, 336 F. Supp. 2d 1311, 1318 (S.D. Fla. 2004) (agreeing that "arbitration is not a 'legal proceeding'"). Thus, when "read together with the arbitration provision," the forum selection clause "does not require the parties to litigate all claims" or "operate to bar arbitration of disputes where otherwise required by contract." <u>Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.</u>, 297 F.3d 388, 395-96 (5th Cir. 2002) (holding that a forum selection clause, which provided that Texas courts shall have "exclusive jurisdiction" over any "suit or proceeding" brought under an agreement, could be read to mean "that the parties must litigate in Texas courts only those disputes that are not subject to arbitration"); <u>see also</u> <u>Sharpe</u>, 769 F.3d at 913, 916 (holding that a forum selection clause, which provided that "[a]ny action brought on matters relating to this Agreement shall be maintained in Dallas," was "not incompatible with the later-added arbitration requirement

12

because lawsuits often precede arbitration (when a court may be asked to decide the validity, scope, and enforceability of an arbitration clause) or follow arbitration (when a court may be asked to enforce or set aside an arbitration award)").

Second, the forum selection clause does not contain any other language indicative of an intent to supersede the preexisting arbitration clause or otherwise preclude arbitration. See, e.g., UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d 319, 329 (4th Cir. 2013) (observing that "one would reasonably expect that a clause designed to supersede, displace, or waive arbitration would mention arbitration"). To the contrary, the forum selection clause expressly contemplates that disputes between the parties may be resolved by means other than litigation, including "arbitration and/or mediation." Master Subcontractor Agreement § 10. Moreover, as the designated subcontractor, Dome Technology specifically agreed to "participate in and be bound by" those proceedings. Id.

For these reasons, this is not a case in which the arbitration clause in one agreement cannot be reconciled with the forum selection clause in another. Compare Applied Energetics, Inc., 645 F.3d at 525 ("Here, the Placement Agreement's language that '[a]ny dispute' between the parties 'shall be adjudicated' by specified courts stands in direct conflict with the Engagement Agreement's parallel language that 'any dispute . . . shall be resolved through binding arbitration.' Both provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other.") (alteration and omission in original), with Pers. Sec. & Safety Sys., Inc., 297 F.3d at 396 ("Rather than covering all 'disputes' or all 'claims' like the arbitration provision in the Product Development Agreement, the forum selection clause confers 'exclusive jurisdiction' on Texas courts only with respect to 'any suit or proceeding.' This limitation suggests that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court."). Instead, the forum selection clause in the Master Subcontractor Agreement "can be

13

understood . . . as complementary to an agreement to arbitrate." Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 284-85 (2d Cir. 2005). Accordingly, the court concludes that the arbitration clause in the Strategic Alliance Agreement remains valid and enforceable, and that the forum selection clause in the Master Subcontractor Agreement does not operate to bar arbitration where it is otherwise required by the parties' contractual terms.

II. **Scope of the Arbitration Agreement**

Having concluded that the arbitration clause is valid and enforceable, the court must now determine whether this dispute falls within the scope of the arbitration clause. At this step of the analysis, the federal policy favoring arbitration comes into play. The court must construe the arbitration clause broadly, resolving any "ambiguities as to [its] scope . . . in favor of arbitration." Adkins, 303 F.3d at 500 (citation and internal quotation marks omitted). Stated differently, the court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 92 (4th Cir. 1996) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).

The arbitration clause at issue in this case extends to "[a]ny dispute, claim, or controversy arising . . . out of or relating to" the interpretation, construction, performance, breach, or enforcement of the Strategic Alliance Agreement. Strategic Alliance Agreement at § 14.4. The Fourth Circuit has recognized that the phrase "ar[ising] out of or relat[ing] to" is a broad one, which is "capable of an expansive reach." Am. Recovery Corp., 96 F.3d at 93 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967)). Such a formulation "does not limit arbitration to the literal interpretation or performance" of the Strategic Alliance Agreement. J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988)

(interpreting an arbitration clause covering all disputes "arising in connection" with the agreement). Instead, "[i]t embraces every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Id. Thus, "the test for an arbitration clause of this breadth is not whether a claim arose under one agreement or another, but whether a significant relationship exists between the claim and the agreement containing the arbitration clause." Am. Recovery Corp., 96 F.3d at 94; see also Gen. Elec. Capital Corp. v. Union Corp. Fin. Grp., 142 F. App'x 150, 152 (4th Cir. 2005) ("The scope of an arbitration clause in one contract can extend to a dispute arising under a second contract, provided that the dispute 'significantly relates' to the first agreement.") (citation omitted).

Applying these principles, the court concludes that Dome Technology's claims against the defendants fall within the scope of the Strategic Alliance Agreement's arbitration clause. The Strategic Alliance Agreement formed the basis of the parties' relationship, and the parties agreed that it would govern their relationship and their participation in the architectural dome projects. The Strategic Alliance Agreement expressly contemplated that Dome Technology and Golden Sands would enter into the Master Subcontractor Agreement and individual subcontracts on a project-by-project basis. Dome Technology's claims are based on Golden Sands' payment obligations under the subcontracts contemplated by the Strategic Alliance Agreement, as well as ABC Domes' guarantee obligations under Section 7.1 of the Strategic Alliance Agreement.[6] Accordingly, the court agrees with the defendants that this dispute is sufficiently related to the Strategic Alliance Agreement so as to bring it within the scope of its arbitration clause. To the extent that there is any ambiguity as to whether the arbitration clause encompasses Dome

---

[6] As indicated above, ABC Domes is not a party to any other contract, and the Strategic Alliance Agreement is the only contract that imposes payment obligations upon ABC Domes.

Technology's claims, any doubts must be resolved in favor of arbitration. See Adkins, 303 F.3d at 500.

## Conclusion

For the reasons stated, the court will grant the defendants' motion to compel arbitration. This action will be stayed pending the completion of the arbitration proceedings, pursuant to 9 U.S.C. § 3. The court will direct the Clerk to close the case for administrative purposes with the understanding that either side may move to reopen the case for good cause.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 28th day of June, 2017.

_____
Chief United States District Judge